Dollie Eason v. Welfare Commissioner[1]

House, C. J., Loiselle, Bogdanski, Longo and Barber, Js.

[1] In accordance with the spirit and intent of General Statutes § 17-70 (b) and Practice Book § 405, it is ordered that the name of the child involved in this appeal shall not be disclosed and that the record, briefs and appendices shall not be distributed to the various libraries of the state by the reporter of judicial decisions. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Superior Court.

*(Two judges dissenting)*

Argued May 5—decision released September 21, 1976

*Charles A. Pirro III*, with whom were *Richard L. Tenenbaum* and *David Branch*, for the appellant (plaintiff).

*Robert A. Nagy*, assistant attorney general, with whom, on the brief, was *Carl R. Ajello*, attorney general, for the appellee (defendant).

LOISELLE, J. The plaintiff appeals from a judgment of the Superior Court dismissing her appeal from the denial by the Juvenile Court of her motion to "reopen" the commitment of a minor child to the welfare commissioner.

On October 10, 1974, the plaintiff filed a motion to "reopen" commitment in Juvenile Court. That motion alleged that, in 1968, a child was placed by her mother with the plaintiff. In 1969, the plaintiff attempted to adopt the child but the natural mother did not consent. In June, 1973, the Juvenile Court, acting upon a petition of neglect against the mother, granted temporary custody of the child to the welfare commissioner who, in turn, placed the child

in the plaintiff's home where the plaintiff assumed the role of a foster parent. In February, 1974, the Juvenile Court committed the child to the custody of the welfare commissioner who continued the child's placement in the plaintiff's home. On October 3, 1974, the welfare commissioner removed the child directly from school to the home of the natural mother. The motion also alleged that the plaintiff, although not the biological mother of the child, is the psychological and emotional parent of the child. The plaintiff alleged that the child had lived with her from September, 1968, to October 3, 1974. In the appeal from the Juvenile Court to the Superior Court, the plaintiff alleges that the child was represented by counsel.

The Juvenile Court treated the motion as one made under General Statutes § 17-62 (f), and considered it as a motion to revoke the commitment of the child to the welfare commissioner. Both parties have characterized the motion in this manner. The Juvenile Court ruled that it had no jurisdiction to hear the plaintiff's motion because § 17-62 (f) fails to include a foster mother as one who may file a motion to revoke. The Superior Court denied the plaintiff's appeal from the Juvenile Court on the same grounds.

The plaintiff has assigned as error the court's failure to find that a foster parent is a "parent" as the word is used in General Statutes § 17-62 (f); that a foster parent has standing to file a motion to revoke commitment in Juvenile Court; that the Juvenile Court has jurisdiction to entertain a motion by a foster parent to revoke commitment.

We turn initially to the plaintiff's contention that she is among those listed in § 17-62 (f). General

Statutes § 17-62 (a)[2] empowers the Juvenile Court to summon the parents or guardian of a child to appear in court when a petition is filed containing information that a child is uncared for and neglected. Subsection (d) of § 17-62[3] provides that after a hearing and adjudication that a child is uncared for or neglected the court may commit the child to the welfare commissioner or other persons and agencies designated in the statute.

The power to revoke such commitment is controlled by § 17-62 (f),[4] which restricts the right to

[2] At the time of the proceedings in Juvenile Court, § 17-62 (a) provided: "Any selectman, town manager, or town, city, or borough welfare department, any probation officer, the Connecticut Humane Society, or the welfare commissioner, the commissioner of children and youth services or any other child-caring institution or agency approved by the welfare commissioner or, after April 1, 1975, the commissioner of children and youth services, having information that a child is neglected, uncared-for or dependent, may file with the juvenile court in the district where such child is resident a verified petition plainly stating such facts as bring the child within the jurisdiction of the court as neglected, uncared-for, within the meaning of section 17-53, or dependent, the name, date of birth, sex, and residence of the child, the name and residence of his parents or guardian, and praying for appropriate action by the court in conformity with the provisions of this chapter. . . ."

[3] [General Statutes] Sec. 17-62 . . . . (d) Commitment to commissioners or private or public agency. Commissioner as guardian, placement. Upon finding and adjudging that any child is uncared-for, neglected or dependent, the court may commit him to the welfare commissioner, or, after April 1, 1975, to the commissioner of children and youth services, or may vest his care and personal custody in any private or public agency which is permitted by law to care for neglected, uncared-for or dependent children or with any person found to be suitable and worthy of such responsibility by the court. . . ."

[4] "[General Statutes] Sec. 17-62. . . . (f) Revocation of commitment. Any court by which a child has been committed pursuant to the provisions of this section may, upon the application of a parent, including any person who acknowledges before said juvenile court paternity of a child born out of wedlock, or other relative of such child, the selectman or any original petitioner, or a licensed child-caring agency or institution approved by the commissioner, or said

file an application for revocation to a "parent," a "relative" and other persons or agencies named therein.

We find without merit the plaintiff's contention that her status is to be found among those listed in § 17-62 (f). The meaning to be given a statute is determined by legislative intent and that legislative intent must be determined by language actually used in the legislation. *Knoll* v. *Kelley*, 142 Conn. 592, 594, 115 A.2d 678. Foster parents are not mentioned in § 17-62 (f). If the legislature had intended to include a foster parent among the persons permitted the right to file an application to revoke commitment, it could easily have done so. Our statutes contain numerous instances in which a distinction is drawn between natural or adoptive parents and foster parents.[5] We presume that the legislature was aware of the use of foster homes when it enacted § 17-62 (f) since it specifically authorized the welfare commissioner to place children committed to him in foster homes in § 17-62 (d). We, therefore, conclude that the legislature intentionally excluded foster parents from § 17-62 (f).

commissioner, and while such child is under the guardianship of said commissioner, upon hearing, after reasonable notice to said commissioner, and, if said commissioner made the application, after reasonable notice to such parent, relative, original petitioner, selectman or child-caring agency or institution, upon finding that cause for commitment no longer exists, revoke such commitment, and thereupon such guardianship and all control of said commissioner over such child shall terminate. Any such court may further revoke the commitment of any child upon application by the commissioner or by the child concerned and after reasonable notice to the parties affected upon a finding that such revocation will be for the best interest and welfare of such child. No hearing shall be held for such reopening and termination of commitment or transfer of commitment more often than once in six months, except upon the application of said commissioner."

[5] See, e.g., General Statutes §§ 17-320, 45-20, 46-1.

The plaintiff also contends that the Juvenile Court has jurisdiction to entertain a motion by a foster parent to revoke commitment. The Juvenile Court is a statutory court. General Statutes §§ 17-53 to 17-74. "It is a familiar principle that a court which exercises a limited and statutory jurisdiction is without jurisdiction to act unless it does so under the precise circumstances and in the manner particularly prescribed by the enabling legislation." *Heiser* v. *Morgan Guaranty Trust Co.*, 150 Conn. 563, 565, 192 A.2d 44. Under § 17-62 (f), one of those specified persons or agencies must apply to trigger the Juvenile Court's power to revoke the commitment to the welfare commissioner. As the plaintiff did not fall within one of those categories, the Juvenile Court did not have jurisdiction to revoke the commitment under §17-62 (f).

The plaintiff asserts that the due process clause of the federal constitution's fourteenth amendment guarantees her the right to initiate a hearing to revoke the commitment to the welfare commissioner. The record of the proceedings of the Juvenile Court includes only a motion entitled "motion to reopen," the court's memorandum of decision and a transcript devoted entirely to comments of counsel. At the hearing on the motion, counsel admitted that the plaintiff was a party at the neglect hearing. The Juvenile Court's memorandum of decision also states that the plaintiff was represented by counsel at that hearing. In any event, there is no claim that the plaintiff was deprived of due process because of the hearings in June, 1973, and in February, 1974. As a result of those hearings, the welfare commissioner was made guardian of the children. The plaintiff had an opportunity to request that

the child be committed to her as a person "suitable and worthy" of the responsibility of caring for the child. See General Statutes § 17-62 (d). In her "motion to reopen," she made no claim that was different from that which she could have made at the neglect hearing. She had an opportunity to be heard at the most critical time in the proceedings before the Juvenile Court. Due process does not require a rehearing of issues that have been litigated. See cases in 16 Am. Jur. 2d, Constitutional Law, § 583.

While the principal brief is mainly concerned with the plaintiff's right to be heard upon the deprivation of her interests in the child, and while the argument is in traditional due process terms, the plaintiff's reply brief emphasizes an equal protection argument: "Appellee has incorrectly stated in his brief that Appellant does not challenge the constitutionality of the classification by the legislature of those persons permitted to seek revocation of commitment in Juvenile Court. . . . Appellant does argue that the word 'parents' in the relevant statute, C.G.S. § 17-62 (f), can be construed to include foster parents. . . . However, if this Court does not see fit to adopt this construction, then Appellant argues it has no other choice but to find C.G.S. § 17-62 (f) unconstitutional." As to her claim of lack of due process because she was not included with the other persons allowed to bring motions for revoking commitment under § 17-62 (f), the argument concerns her right under the equal protection clause of the fourteenth amendment. The issue, then, is not whether a foster parent should be included as one who may initiate a hearing to preserve interests in a child, but whether a foster parent should be included among those who may

move to revoke a commitment to the welfare commissioner, now commissioner of children and youth services.

The requirement of equal protection of the laws does not deny a state the right to make classifications in law so long as there is no invidious discrimination. *Williamson* v. *Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S. Ct. 461, 99 L. Ed. 563, reh. denied, 349 U.S. 925, 75 S. Ct. 657, 99 L. Ed. 1256. "Under traditional equal protection principles, a State retains broad discretion to classify as long as its classification has a reasonable basis." *Graham* v. *Richardson,* 403 U.S. 365, 371, 91 S. Ct. 1848, 29 L. Ed. 2d 534. In the area of social welfare, a statute is not impermissible because the classifications are imperfect. So long as a classification has some reasonable basis, the statute does not offend constitutional requirements simply because a classification found therein " 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U.S. 61, 78 [31 S. Ct. 337, 55 L. Ed. 369]." *Dandridge* v. *Williams,* 397 U.S. 471, 485, 90 S. Ct. 1153, 25 L. Ed. 2d 491, reh. denied, 398 U.S. 914, 90 S. Ct. 1684, 26 L. Ed. 2d 80. In *McGowan* v. *Maryland,* 366 U.S. 420, 81 S. Ct. 1101, 6 L. Ed. 2d 393, the court said (p. 425): "Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their

constitutional power despite the fact that, in practice, their laws result in some inequality." A proper classification must include all who naturally belong to the class. There must be some natural and substantial difference germane to the subject or purposes of the legislation between those within the class and those excluded. *Kellems* v. *Brown,* 163 Conn. 478, 493, 313 A.2d 53, appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678.

It would seem that a legislature could reasonably make a distinction between a foster parent and those included in the statute as parties who may move to revoke commitment to the commissioner. A logical argument can be made that a foster parent, after having had a child in its care for some appreciable time, becomes a psychological parent and that its interest in the child is equal to that of a biological parent. A reasonable extension of this argument would also include any considerate neighbor or relative who has had a child for a period of time for one reason or another.

On the other hand, once a commitment has been made, foster parents and concerned relatives and neighbors generally act more on a temporary basis, with the legal guardianship of the child in another. Although in some instances a long-term placement may develop a close relationship between the foster parent and child, generally speaking, a foster parent acts more as a custodian awaiting either the return of the child to parents or the adoption of the child. Goldstein, Freud & Solnit, "Beyond the Best Interests of the Child," p. 23. Furthermore, after a commitment under § 17-62 (d) to the welfare commissioner a foster parent derives custody from the commissioner's placement. It is reasonable to

include those who are legally responsible and biologically related to a child among those that have a statutory right to move to revoke the guardianship and custody of the commissioner and to exclude those who derive custody from the commissioner.

There is no error.

In this opinion HOUSE, C. J., and BARBER, J., concurred.

LONGO, J. (dissenting.) I respectfully dissent. It seems to me that the plaintiff had the constitutional right to a hearing after the child was taken from her custody in October, 1974, and that General Statutes § 17-62 (f) is an appropriate avenue for pressing this claim under the unique circumstances of this case.

The thrust of the majority opinion in this regard is that the plaintiff received all the due process to which she was entitled by virtue of her appearance with counsel at the February, 1974, hearing when a finding of neglect by the natural mother was made and custody of the child was transferred to the welfare department. In my opinion, however, the due process accorded the plaintiff at the hearing on the issue of the natural mother's neglect cannot limit or govern the due process right to a hearing which arose in the plaintiff after the state had entrusted the child to her and then summarily removed the child from her care. That due process must be accorded in a state action involving revocation of a state-given right or privilege has been a concept developed in the opinions of the United States Supreme Court in recent years. As examples, it is now well-established that elements of due process such as notice and the opportunity for a hear-

ing and cross-examination must be present in proceedings to revoke welfare benefits; *Goldberg* v. *Kelly,* 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287; driver's licenses; *Bell* v. *Burson,* 402 U.S. 535, 91 S. Ct. 1586, 29 L. Ed. 2d 90; and parole and probation; *Morrissey* v. *Brewer,* 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484; *Gagnon* v. *Scarpelli,* 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656. It seems to me that the state's removal of foster children from foster parents should be no less subject to the same guarantees.

In *Stanley* v. *Illinois,* 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551, a natural father successfully challenged an Illinois statute which allowed the state to deprive him of custody of his illegitimate children without a hearing. The court held that individual hearings were constitutionally required before the state could separate unfit parents from their children, and stated (p. 651): "It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' *Kovacs* v. *Cooper,* 336 U.S. 77, 95 [69 S. Ct. 448, 93 L. Ed. 513] (1949) (Frankfurter, J., concurring)."

*Stanley* is distinguishable from the present case in that the plaintiff here is not the natural parent of the child in question. Recent cases, however, have blurred the distinction between rights of natural parents and the rights of foster parents in this area; see, e.g., *Borsdorf* v. *Mills,* 49 Ala. App. 658, 275 So. 2d 338; *In re One Minor Child,* 254 A.2d 443 (Del.); *In re Fleming,* 271 Minn. 337, 136

N.W.2d 109; *Pace* v. *Curtis,* 496 S.W.2d 931 (Tex. Civ. App.); and much commentary has been written in recent years about biological and psychological parents and to what respect each is entitled in custody determinations. One of the most influential works in the area is Goldstein, Freud & Solnit, "Beyond the Best Interests of the Child," in which the authors contend (p. 19) that the role of a psychological parent may be filled by any concerned, attentive adult on the basis of "day-to-day interaction, companionship, and shared experiences."

I do not suggest that all legal distinctions between biological, legal and psychological parents be abolished, but rather suggest that the one who has cared for a child over a long period of time will develop mutual bonds of love and dependence with the child. Despite the lack of a biological tie in this case, the plaintiff has stood in loco parentis since the child was four months old and was for six years, until the child was removed from her home, the only full-time mother the child had ever known. Under these circumstances, the absence of a biological connection cannot be regarded as fatal to the plaintiff's claim.

In *James* v. *McLinden,* 341 F. Sup. 1233 (D. Conn.), the court held that failure to notify foster parents of the filing of a petition of alleged neglect violated the due process and equal protection guarantees of the fourteenth amendment, as well as the express terms of General Statutes § 17-61. The court observed (p. 1235): "There is no sound reason to deny a person who has voluntarily assumed the obligations of parenthood over a child the same basic rights to due process a natural or legal parent possesses when the state

intervenes to disrupt or destroy the family unit." Of course, in the present case, the plaintiff did attend the hearing on the neglect petition, although she did not participate. Nonetheless, the principle announced in *James* v. *McLinden* has equal currency when applied to the state's action removing the child from the plaintiff's care. The latter action was taken with no due process guarantees; the plaintiff has averred that she received a letter which informed her of the commissioner's decision and that the child was then removed directly from school to the home of the natural mother. Under the circumstances the plaintiff had, at a minimum, the right to a hearing with respect to the propriety of the commissioner's action.

In a recent decision, a three-judge district court invalidated on fourteenth amendment grounds a New York statute which allowed the state to remove foster children from foster homes without affording a prior evidentiary hearing to either parents or children. The court held (p. 282) that, in placements lasting over one year, "before a foster child can be peremptorily transferred from the foster home in which he has been living, be it to another foster home or to the natural parents who initially placed him in foster care, he is entitled to a hearing at which all concerned parties may present any relevant information to the administrative decisionmaker charged with determining the future placement of the child." *Organization of Foster Families* v. *Dumpson,* 418 F. Sup. 277 (S.D. N.Y.).

It is thus apparent that the state action in removing the child from the plaintiff-foster parent's home should be subject to the due process guarantees of the fourteenth amendment. To vindicate this right, the plaintiff proceeded under General

Statutes § 17-62 (f) to move to "reopen" the commitment in the Juvenile Court. The essential allegation in her motion to "reopen" is not that she has a right to continued custody of the child, but that "[i]n handling the placement change in this emergency manner, the Welfare Department disrupted the most significant relationship [the child] has in a substitute family that she sees as her own and created exactly the kind of traumatic situation which its guidelines state must be avoided." It is therefore clear that, while the motion was not filed by the child, it was filed for the child. And, although the plaintiff as a foster mother is not given the right to file such a motion in her own behalf, the legislature has specified in § 17-62 (f) that the child is a proper party to move to "reopen" commitment. As a practical matter, a child may often be unable to bring a court suit of his own initiative. Accordingly, there must be some instances in which another party is entitled to file under § 17-62 (f), asserting the rights of the child and giving effect to the legislative intent. The plaintiff's unique position in this case so entitles her.

I am unpersuaded that an action under § 17-62 (f) should be foreclosed by a strict reading of that statute. The plaintiff's motion raised before the Juvenile Court the issue of whether the welfare department's action was in the best interest of the child. The legislature has explicitly vested "exclusive original jurisdiction" over matters pertaining to the custody of neglected children in the Juvenile Court. General Statutes § 17-59. As a motion under § 17-62 (f) is the most efficacious manner in which the best interest of the child can be determined, the plaintiff's motion should have been considered in that light and decided on the merits.

In conclusion, then, the child has rights and interests which must be effectively protected, just as the plaintiff has rights which must be vindicated. A hearing conducted under General Statutes § 17-62 (f) is a fact-finding proceeding at which the child's best interest is determined from an examination of all the relevant circumstances and events. Likewise, a determination by the department that a foster parent is not acting in the best interest of the child is based wholly on facts which should be established only after the protections of due process have been extended to the foster parent. See *Goldberg* v. *Kelly,* 397 U.S. 254, 269, 90 S. Ct. 1011, 25 L. Ed. 2d 287. As the rights are not protected and guarantees of due process have been denied in the present case, the welfare department's action is open to challenge by the plaintiff-foster parent, and a hearing conducted pursuant to General Statutes § 17-62 (f) is an appropriate method for resolving issues pertaining to the best interest of the child, and the adequacy of the plaintiff's care.

In this opinion BOGDANSKI, J., concurred.