IN RE JUVENILE APPEAL (85–BC)*
(12479)
(12480)

PETERS, C. J., HEALEY, SHEA, DANNEHY and SANTANIELLO, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed and the records and briefs will not be distributed to the various libraries of the state. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Supreme Court.

Argued November 8, 1984—decision released February 26, 1985

*Frederick D. Stanek,* for the appellant (grandmother).

*Judith M. Earl,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *Paul J. Bakulski,* assistant attorney general, for the appellant (commissioner of the department of children and youth services).

*George R. Temple,* for the appellee (mother).

ARTHUR H. HEALEY, J. This appeal presents the question whether, under General Statutes § 46b-129,[1]

[1] General Statutes (Rev. to 1983) § 46b-129 provides: "(a) Any selectman, town manager, or town, city, or borough welfare department, any probation officer, the Connecticut Humane Society, or the commissioner of human resources, the commissioner of children and youth services or any child-caring institution or agency approved by the commissioner of children and youth services, a child or his representative or attorney or a foster parent of a child, having information that a child or youth is neglected, uncared-for or dependent, may file with the superior court which has venue over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent, within the meaning of section 46b-120, the name, date of birth, sex, and residence of the child or youth, the name and residence of his parents or guardian, and praying for appropriate action by the court in con-

## the commissioner of the department of children and youth services (DCYS) must petition to extend a com-

formity with the provisions of this chapter. Upon the filing of such a petition, the court shall cause a summons to be issued requiring the parent or parents or the guardian of the child or youth to appear in court at the time and place named, which summons shall be served not less than fourteen days before the date of the hearing in the manner prescribed by section 46b-128, and said court shall further give notice to the petitioner and to the commissioner of children and youth services of the time and place when the petition is to be heard not less than fourteen days next preceding the hearing in question.

"(b) If it appears from the allegations of the petition and other verified affirmations of fact accompanying the petition, or subsequent thereto, that there is reasonable cause to find that the child's or youth's condition or the circumstances surrounding his care require that his custody be immediately assumed to safeguard his welfare, the court shall either (1) issue an order to the parents or other person having responsibility for the care of the child or youth to show cause at such time as the court may designate why the court shall not vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing on the petition, or (2) vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing upon the petition which shall be held within ten days from the issuance of such order on the need for such temporary care and custody. The service of such orders may be made by any officer authorized by law to serve process, or by any probation officer appointed in accordance with section 46b-123, investigator from the department of administrative services, state police officer or indifferent person. The expense for any temporary care and custody shall be paid by the town in which such child or youth is at the time residing, and such town shall be reimbursed therefor by the town found liable for his support, except that where a state agency has filed a petition pursuant to the provisions of subsection (a) of this section, the agency shall pay such expense.

"(c) When a petition is filed in said court for the commitment of a child or youth, the commissioner of children and youth services shall make a thorough investigation of the case and shall cause to be made a thorough physical and mental examination of the child or youth if requested by the court. The court after hearing on the petition and upon a finding that the physical or mental ability of a parent or guardian to care for the child or youth before the court is at issue may order a thorough physical or mental examination, or both, of the parent or guardian whose competency is in question. The expenses incurred in making such physical and mental examinations shall be paid as costs of commitment are paid.

"(d) Upon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit him to the commissioner of children and youth services for a maximum period of eighteen months, unless such period is extended in accordance with the provisions of sub-

mitment of custody of two minor children, who had been adjudicated neglected, when their custody was

section (e) of this section, provided such commitment or any extension thereof may be revoked or parental rights terminated at any time by the court, or the court may vest such child's or youth's care and personal custody in any private or public agency which is permitted by law to care for neglected, uncared-for or dependent children or youth or with any person found to be suitable and worthy of such responsibility by the court. The commissioner shall be the guardian of such child or youth for the duration of the commitment, provided the child or youth has not reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a secondary school, a technical school, a college or a state-accredited job training program, provided such child or youth has not reached the age of twenty-one, by consent of such youth, or until another guardian has been legally appointed, and in like manner, upon such vesting of his care, such other public or private agency or individual shall be the guardian of such child or youth until he has reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a secondary school, a technical school, a college or a state-accredited job training program, until such child or youth has reached the age of twenty-one years or until another guardian has been legally appointed. Said commissioner may place any child or youth so committed to him in a suitable foster home or in the home of a person related by blood to such child or youth or in a licensed child-caring institution or in the care and custody of any accredited, licensed or approved child-caring agency, within or without the state, provided a child shall not be placed outside the state except for good cause and unless the parents of such child are notified in advance of such placement and given an opportunity to be heard, or in a receiving home maintained and operated by the commissioner of children and youth services. In placing such child or youth, said commissioner shall, if possible, select a home, agency, institution or person of like religious faith to that of a parent of such child or youth, if such faith is known or may be ascertained by reasonable inquiry, provided such home conforms to the standards of said commissioner.

"(e) Ninety days before the expiration of each eighteen-month commitment made in accordance with the provisions of subsection (d) of this section and each extension made pursuant to the provisions of this subsection, the commissioner of children and youth services shall petition the court either to (1) revoke such commitment, in accordance with the provisions of subsection (g) of this section, or (2) terminate parental rights in accordance with the provisions of section 17-43a, or (3) extend the commitment beyond such eighteen-month period on the ground that an extension is in the best interest of the child. The court shall give notice to the parent, parents or guardian and to the child or youth at least fourteen days prior to the hearing on such petition. Upon finding that an extension is in the best interest of the child, the court may extend the commitment for a period of eighteen months.

"(f) The commissioner of children and youth services shall pay directly

committed originally to the commissioner but subsequently had been transferred to their paternal grandmother by order of the Superior Court for Juvenile Matters.

to the person or persons furnishing goods or services determined by said commissioner to be necessary for the care and maintenance of such child or youth the reasonable expense thereof, payment to be made at intervals determined by said commissioner; and the comptroller shall draw his order on the treasurer, from time to time, for such part of the appropriation for care of committed children or youth as may be needed in order to enable the commissioner to make such payments. Said commissioner shall include in his annual budget a sum estimated to be sufficient to carry out the provisions of this section. Notwithstanding that any such child or youth has income or estate, the commissioner may pay the cost of care and maintenance of such child or youth. The commissioner may bill to and collect from the person in charge of the estate of any child or youth aided under this chapter, including his decedent estate, or the payee of such child's or youth's income, the total amount expended for care of such child or youth or such portion thereof as any such estate or payee is able to reimburse.

"(g) Any court by which a child or youth has been committed pursuant to the provisions of this section may, upon the application of a parent, including any person who acknowledges before said court paternity of a child or youth born out of wedlock, or other relative of such child or youth, the selectman or any original petitioner, or a licensed child-caring agency or institution approved by the commissioner, or said commissioner, and while such child or youth is under the guardianship of said commissioner, upon hearing, after reasonable notice to said commissioner, and, if said commissioner made the application, after reasonable notice to such parent, relative, original petitioner, selectman or child-caring agency or institution, upon finding that cause for commitment no longer exists, revoke such commitment, and thereupon such guardianship and all control of said commissioner over such child or youth shall terminate. The court may further revoke the commitment of any child or youth upon application by the commissioner or by the child or youth concerned and after reasonable notice to the parties affected upon a finding that such revocation will be for the best interest and welfare of such child or youth. No hearing shall be held for such reopening and termination of commitment or transfer of commitment more often than once in six months, except upon the application of said commissioner.

"(h) Upon service on the parent, guardian or other person having control of the child or youth of any order issued by the court pursuant to the provisions of subsections (b) and (d) of this section, the child or youth concerned shall be surrendered to the person serving the order who shall forthwith deliver the child or youth to the person, agency, department or institution awarded custody in such order. Upon refusal of the parent, guard-

The following facts are critical to this appeal: On February 11, 1981, the commissioner of DCYS filed in the Waterbury Superior Court for Juvenile Matters separate petitions, each alleging neglect of the two children involved in this particular dispute.[2] The neglect petitions requested that both minor children, one then aged three years, nine months, and the other two years, four months, be adjudicated neglected and committed to the custody of DCYS.[3] After a hearing, the court, on September 23, 1981, found the children neglected and entered orders committing them, pursuant to General Statutes (Rev. to 1981) § 46b-129 (d), to the cus-

ian or other person having control of the child or youth to surrender the child or youth as provided in the order, the court may cause a warrant to be issued charging the parent, guardian or other person having control of the child or youth with contempt of court. If the person arrested is found in contempt of court, the court may order such person confined until he purges himself of contempt, but for not more than six months, or may fine such person not more than five hundred dollars, or both.

"(i) A foster parent shall have standing for the purposes of this section in superior court in matters concerning the placement or revocation of commitment of a foster child living with such parent. A foster parent shall receive notice of any application to revoke commitment or any hearing on such application."

[2] The male child, then two years and four months of age, was alleged by DCYS to be neglected within the statutory definition of General Statutes § 46b-120 in that: "The child has been abused:

"a) The child has had injuries inflicted upon him by other than accidental means according to C.G.S. 17-38a. When examined 1/9/81 at Yale-New Haven Hospital he was observed to have multiple bruises on his body.

"b) The child is in a condition which is the result of maltreatment. When examined 1/9/81 at Yale-New Haven Hospital he was diagnosed to be suffering from Chronic Dehydration and possible Scalies."

The female child, then three years, eight months of age, was alleged by DCYS to be neglected within the statutory definition of General Statutes § 46b-120: "The child is neglected in that she is being allowed to live under circumstances injurious to her well-being. She has lived under the same circumstances in which her brother . . . was abused and has faced the possibility of physical injury."

[3] General Statutes (Rev. to 1981) § 46b-129 (d) provides in part that: "Upon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit him to the commissioner of children and youth services . . . ."

tody of DCYS for a period not to exceed two years.[4] Previously, the children had been "placed" by DCYS, on January 26, 1981, with their paternal grandparents with whom they had been residing at the time of the "Order of Commitment" to DCYS. Under the "Order of Commitment" to DCYS, the children continued to reside with their paternal grandparents, although DCYS possessed "legal" custody of the children. Thereafter, on May 4, 1982, the court, acting on DCYS' "Motion for Transfer of Commitment," entered "Orders of Custody" that granted *"custody-guardianship"* of these children to their paternal grandmother. (Emphasis in original.) DCYS continued to be involved with the case, however, by monitoring their education and therapy.

Later, the natural mother filed a "Petition for Revocation of Commitment" on June 22, 1983.[5] This matter came before the court on July 19, and was continued to September 20, 1983, to enable DCYS to prepare a study of the children's situation. As prepared and submitted to the Juvenile Court, the DCYS study recom-

[4] Prior to 1979, a commitment of a child's custody to DCYS could be continued until the child reached the age of majority. The General Assembly then established a two year limitation on the duration of a commitment to DCYS. Public Acts 1979, No. 79-579. The two year limitation subsequently was reduced to a maximum period of commitment of eighteen months. Public Acts 1982, No. 82-181, codified at General Statutes § 46b-129 (d) and (e); see footnote 1, supra.

[5] The mother's "Petition for Revocation of Order of Commitment" alleged: "Your petitioner represents that at a session of the Superior Court held at Waterbury on the 23rd day of September 1981 *an order was passed committing [the children in question] . . . to the paternal grandmother . . . .*

"Your petitioner respectfully requests the Court to revoke said commitment and return the custody of said child or children to the petitioner for the following reasons:

"It is in the best interest of the children that they should be with their natural mother.

"The natural mother has also been regularly visiting the children." (Emphasis added.)

mended, inter alia, that certain steps be taken by the natural parents and paternal grandparents of these children, who would "continue to live with their grandparents." The DCYS study also recommended that the natural mother be allowed weekly visitation "in a structured setting" with the children. All parties apparently agreed to abide by the DCYS recommendations, which were incorporated into orders of the court. The court then continued the matter to December 14, 1983, for further review.

Thereafter, DCYS, on December 12, 1983, submitted to the court an "addendum" to its original study. This "addendum" recommended, inter alia, that the natural mother's petition for revocation of commitment be denied but that the children's commitment be retransferred to DCYS for an eighteen-month period during which time the children would continue to reside with the paternal grandparents while remaining "under the protective supervision of DCYS. . . ." On December 14, 1983, the court requested that the paternal grandmother file a motion for clarification of the orders of custody,[6] which she accordingly filed on December 20, 1983, in conjunction with her motion for continuation of custody of the two children.[7] In response to these motions, the court sua sponte dismissed the natural

---

[6] In the "motion for clarification of orders," the grandmother "respectfully represents that orders of custody were entered by Judge DeMayo on May 4, 1982 placing custody and guardianship of the two minor children [names omitted] with her, the paternal grandmother of said children. [She] respectfully requests that the Court clarify said orders and any other orders affecting this matter given the amount of time that has passed since the entry of the orders of custody."

[7] In the "motion for continuation of custody," the "paternal grandmother of the children who are the subject of this matter, respectfully moves that the Court continue the order of custody entered by Judge DeMayo on May 4, 1982 whereby said children were committed to the custody and guardianship of [the paternal grandmother who] . . . files this Motion in the event that it is necessary following the Court's ruling on her Motion for Clarification made this date."

mother's petition for revocation of commitment, finding that "there is no matter pending before this court, the original commitment having expired."[8] While no articulation of this ruling was sought, the parties agree that the court dismissed the natural mother's petition for revocation of commitment on the ground that the maximum statutory period for which the children's custody had been committed to DCYS had elapsed; General Statutes § 46b-129 (d); and because of a lack of appropriate action by that agency to extend the period pursuant to § 46b-129 (e), the order transferring custody of the minor children to their paternal grandmother had lapsed. Under this decision custody of these children hence reverted to their natural parents.

On appeal, both appellants, the paternal grandmother and DCYS, claim that the court erred in concluding that the "commitment" in each case had expired for failure of DCYS to petition the court for an extension of commitment in accordance with § 46b-129 (e). We find error and hold that the statutory eighteen month maximum period of commitment to DCYS does not apply to those cases in which custody of children, adjudicated neglected, has been vested pursuant to a Superior Court order in an appropriate third party under § 46b-129 (d).

We recognize initially that the established public policy in this state is "[t]o protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; [and] to provide a temporary or permanent nurturing and safe environment for children when necessary . . . ." General Statutes

---

[8] The order in its entirety states: "The foregoing Motion, having come before the Court, and it having been heard, it is hereby ordered as follows: The court finds that there is no matter pending before this court—The original commitment having expired. This order is stayed for 20 days."

§ 17-38a (a); *In re Juvenile Appeal (83–CD)*, 189 Conn. 276, 283, 455 A.2d 1313 (1983); *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 660, 420 A.2d 875 (1979). We are also aware that "the right to family integrity is not a right of the parents alone, but 'encompasses the reciprocal rights of both parents and children. . . .'" (Citations omitted.) *In re Juvenile Appeal (83–CD)*, supra, 284.

The sole question presented here turns primarily on the interpretation of General Statutes § 46b-129. We have said that "[t]he meaning to be given a statute is determined by legislative intent and that legislative intent must be determined by language actually used in the legislation." (Citation omitted.) *Eason* v. *Welfare Commissioner*, 171 Conn. 630, 634, 370 A.2d 1082 (1976), cert. denied, 432 U.S. 907, 97 S. Ct. 2953, 53 L. Ed. 2d 1079 (1977) (child welfare statutes construed). We accordingly examine the express language of § 46b-129.

Section 46b-129 governs petitions for adjudication of neglected children and the appropriate "commitment" of their custody. After a judicial determination that a child is "uncared-for, neglected or dependent" the Superior Court has available three possible options from which to choose regarding custody of that child: (1) to "commit [the child] to the commissioner of children and youth services"; (2) to "vest such child's or youth's care and personal custody" in a third party until the child reaches the age of eighteen; or (3) to permit the natural parent to retain custody and guardianship of the child,[9] with or without protective supervision by DCYS. General Statutes § 46b-129 (d).

---

[9] Although a court order continuing the custody of the neglected child in the natural parent is not expressly provided for in General Statutes § 46b-129 (d), this third option is implicit in the legislature's use of the permissive term "may" throughout that subsection. See *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 659, 420 A.2d 875 (1979). As the court "may"

Until the enactment of Public Acts 1979, No. 79-579, no significant distinction existed, at least for the purposes of the duration of a commitment of custody, between a "commitment" to DCYS of the child's custody and the "vesting" of custody in an appropriate third party; both dispositions could continue without further subsequent action until the child reached the age of eighteen. This 1979 legislation established, however, a two year maximum time limit as the period of the commitment of custody. Public Acts 1979, No. 79-579.[10] That time limit, which was subsequently

commit custody to DCYS or vest it in a suitable third party, implicitly a judicial determination may also be made that under the particular circumstances of a given case the best interests of the child are furthered only by permitting the natural parent to retain custody.

[10] "Substitute House Bill No. 6368
"PUBLIC ACT NO. 79-579
"AN ACT CONCERNING THE COMMITMENT OF CHILDREN TO THE DEPARTMENT OF CHILDREN AND YOUTH SERVICES.
"Section 46b-129 of the general statutes is repealed and the following is substituted in lieu thereof . . . .
"(d) Upon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit him [to the commissioner of human resources, or] to the commissioner of children and youth services FOR A MAXIMUM PERIOD OF TWO YEARS, UNLESS SUCH PERIOD IS EXTENDED IN ACCORDANCE WITH THE PROVISIONS OF SUBSECTION (e) OF THIS SECTION, PROVIDED SUCH COMMITMENT OR ANY EXTENSION THEREOF MAY BE REVOKED OR PARENTAL RIGHTS TERMINATED AT ANY TIME BY THE COURT, or THE COURT may vest [his] SUCH CHILD'S OR YOUTH'S care and personal custody in any private or public agency which is permitted by law to care for neglected, uncared-for or dependent children or youth or with any person found to be suitable and worthy of such responsibility by the court. The commissioner to whom the child or youth is committed shall be the guardian of such child or youth [until he has] FOR THE DURATION OF THE COMMITMENT, PROVIDED THE CHILD OR YOUTH HAS NOT reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a secondary school, a technical school, a college or a state accredited job training program, [until] PROVIDED such child or youth has NOT reached the age of twenty-one, by consent of such youth, or until another guardian has been legally appointed, and in like manner, upon such vesting of his care, such other public or private agency or individual shall be the guardian of such child or youth until he has reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a

reduced by the legislature to eighteen months; see foot-
note 4, supra; was placed only upon "commitments"
made "to the commissioner of children and youth ser-
vices." General Statutes § 46b-129 (d). Child custody
"vested" in appropriate third parties by the court, how-
ever, remained statutorily unrestricted in terms of any
duration on the period of such custody.

This 1979 provision, inter alia, required the "com-
missioner of children and youth services," at least

secondary school, a technical school, a college or a state accredited job train-
ing program, until such child or youth has reached the age of twenty-one
years or until another guardian has been legally appointed. [Either] SAID
commissioner may place any child or youth so committed to him in a suita-
ble foster home or in the home of a person related by blood to such child
or youth or in a licensed child-caring institution or in the care and custody
of any accredited, licensed or approved child-caring agency, within or with-
out the state, provided a child shall not be placed outside the state except
for good cause and unless the parents of such child are notified in advance
of such placement and given an opportunity to be heard, or in a receiving
home maintained and operated by [the commissioner of human resources
or by] the commissioner of children and youth services. In placing such child
or youth, said commissioner shall, if possible, select a home, agency, insti-
tution or person of like religious faith to that of a parent of such child or
youth, if such faith is known or may be ascertained by reasonable inquiry,
provided such home conforms to the standards of said commissioner.
"(e) NINETY DAYS BEFORE THE EXPIRATION OF EACH TWO-
YEAR COMMITMENT MADE IN ACCORDANCE WITH THE PROVI-
SIONS OF SUBSECTION (d) OF THIS SECTION AND EACH EXTEN-
SION MADE PURSUANT TO THE PROVISIONS OF THIS
SUBSECTION, THE COMMISSIONER OF CHILDREN AND YOUTH
SERVICES SHALL PETITION THE COURT EITHER TO (1) REVOKE
SUCH COMMITMENT, IN ACCORDANCE WITH THE PROVISIONS
OF SUBSECTION (g) OF THIS SECTION, OR (2) TERMINATE PAREN-
TAL RIGHTS IN ACCORDANCE WITH THE PROVISIONS OF SEC-
TION 17-43a, OR (3) EXTEND THE COMMITMENT BEYOND SUCH
TWO-YEAR PERIOD ON THE GROUND THAT AN EXTENSION IS
IN THE BEST INTEREST OF THE CHILD. THE COURT SHALL GIVE
NOTICE TO THE PARENT, PARENTS OR GUARDIAN AND TO THE
CHILD OR YOUTH AT LEAST FOURTEEN DAYS PRIOR TO THE
HEARING ON SUCH PETITION. UPON FINDING THAT AN EXTEN-
SION IS IN THE BEST INTEREST OF THE CHILD, THE COURT MAY
EXTEND THE COMMITMENT FOR A PERIOD OF TWO YEARS
. . . ."

"ninety days before the expiration" of "each two-year commitment made in accordance with the provisions of subsection (d) of this section [46b-129]," to petition the court to "(1) revoke such commitment"; "(2) terminate parental rights" in accordance with § 17-43a; or "(3) extend the commitment beyond such two-year period on the ground that an extension is in the best interest of the child." General Statutes (Rev. to 1981) § 46b-129 (e). The 1979 amendment by its terms applied only to commitments "made in accordance with the provisions of subsection (d)" and was not made applicable by the legislature to § 46b-129 (g). No "ninety day rule" or requirement similar to § 46b-129 (e) was imposed by the General Assembly on court orders entered pursuant to the "transfer" or "termination" of commitment provision of § 46b-129 (g).

With that statutory scheme in mind, we examine the posture of the parties on appeal. The natural mother contends that the trial court did not err because the maximum period of commitment to DCYS, without any judicially approved extension, is eighteen months under § 46b-129 (d); no such extension was requested by DCYS in accordance with § 46b-129 (e), and, therefore, the original commitment of the children to DCYS expired. She further argues that the transfer of commitment to the paternal grandmother did not obviate the requirement that DCYS petition the court for an extension of commitment pursuant to § 46b-129 (e) (3). The paternal grandmother, on the other hand, argues that the court, by transferring "custody-guardianship" of the children to her, "vested" custody in accordance with § 46b-129 (d) in her as a "person found to be suitable and worthy of such responsibility by the court." The grandmother argues that DCYS involvement, as it relates to the commitment to the commissioner, has been terminated under § 46b-129 (g) and that there was accordingly no requirement for an extension request

by the commissioner under § 46b-129 (e) (3). The attorney general emphasizes that because the court "transferred commitment," the commissioner was in no position to file a petition to extend the commitment under § 46b-129 (e) in behalf of the relative; by the court's vesting of custody in the paternal grandmother under § 46b-129 (d), the commissioner no longer had any control over the matter.

The commitment of the children to DCYS in the present case was ordered on September 23, 1981, pursuant to § 46b-129 (d), by the Superior Court, which had found them to be neglected. Prior to the expiration of this commitment to DCYS, the Superior Court, on May 4, 1982, acting under § 46b-129 (g) "revoked" the commitment and "transferred" the custody of the children to the paternal grandmother. The legal effect of that transfer of custody was to "vest" custody-guardianship of the children in the paternal grandmother, in accordance with the second option set forth in § 46b-129 (d) that was available to the court;[11] as a result, the children were no longer "committed" to the custody of DCYS.[12] Because there was no longer any commitment of the children to DCYS, § 46b-129 (e) imposed no obligation upon the DCYS commissioner to petition the court to act in accordance with the ninety day rule of that provision. The statutory scheme involving the commitment of the custody of neglected children does not impose an obligation upon the paternal grandmother

[11] In relevant part, General Statutes § 46b-129 (d) provides: "Upon finding and adjudging that any child or youth is . . . neglected . . . the court may vest such child's or youth's care and personal custody . . . with any person found to be suitable and worthy of such responsibility by the court."

[12] In relevant part, General Statutes § 46b-129 (d) provides: "The commissioner [of DCYS] shall be the guardian of such child or youth for the duration of the commitment . . . until another guardian has been legally appointed, and in like manner, *upon such vesting of his care, such . . . individual shall be the guardian* of such child or youth until he has reached the age of eighteen years . . . ." (Emphasis added.)

in this case to petition the court to extend their commitment to her in order to avoid any automatic revocation for failure to follow the ninety day time frame that might have arisen had the commitment remained with the DCYS commissioner. In the absence of such a legislative directive, we decline any invitation to impose judicially upon such a third party an obligation corresponding to the statutory mandate that § 46b-129 (e) imposes on the DCYS commissioner.

The result that we reach here comports with the legislative intent to affix time limits to commitments of custody to DCYS. See *Skorpios Properties, Ltd.* v. *Waage,* 172 Conn. 152, 154–55, 374 A.2d 165 (1976). Statutes should be construed to give effect, when possible, to legislative intent. *Robinson* v. *Unemployment Security Board of Review,* 181 Conn. 1, 6, 434 A.2d 293 (1980); *State* v. *Campbell,* 180 Conn. 557, 561, 429 A.2d 960 (1980); *Winchester* v. *Connecticut State Board of Labor Relations,* 175 Conn. 349, 359–60, 402 A.2d 332 (1978); *Bell* v. *Planning & Zoning Commission,* 173 Conn. 223, 226, 377 A.2d 299 (1977); *Kellems* v. *Brown,* 163 Conn. 478, 505–506, 313 A.2d 53 (1972), appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973). We are aware, however, that "[c]ourts cannot import into legislation an intent not expressed in some appropriate manner." *Loew* v. *Falsey,* 144 Conn. 67, 72, 127 A.2d 67 (1956).

The legislative intent underlying the maximum period of commitment is twofold: First, the General Assembly recognized a concern for those children, committed by the court to the DCYS commissioner, and who then were placed in foster care for indeterminate and often lengthy periods of time without any further judicial review. 22 S. Proc., Pt. 17, 1979 Sess., pp. 5859–60,

5862;[13] 22 H. R. Proc., Pt. 24, 1979 Sess., pp. 8449–51, 8454, 8455.[14] The legislative limitation on the period

[13] The following are relevant excerpts from state Senate proceedings of June 5, 1979:

"Senator Curry . . . .

"It is a bill which at every stage it has been considered, it has received overwhelming approval. *The purpose of this bill is to limit to two years the amount of time for which a child may be committed to the Department of Children and Youth Services.* The bill would require that any child committed for a period of two years would be entitled to a review at the end of that two year period in order to decide, based upon a consideration of the best interest of the child whether or not the child ought to continue to be entrusted to the care of the Department of Children and Youth Services or should receive a permanent placement in a home or perhaps reunited with the child's natural family. I believe very strongly in my heart that this is a very good bill and it's a reaction to something we have all grown to understand which is that short term, a succession of short term placements of children, even while it is sometimes necessary, is something which we recognize tends to destroy the fundamental fabric of that child's psychological well-being, deprives the child of continuity of educational experience, continuity of environment and most of all, continuity of familial love; so that we are attempting here to at least insure that while we recognize that it is often necessary to find whatever may be the best place that we can find to place a child, the state will do all that it can to provide permanent placement in stable situations for as many of the children who come for whatever period of time to our care as we can." (Emphasis added.) 22 S. Proc., Pt. 17, 1979 Sess., pp. 5859–60.

"Senator Denardis: (34th)

"Mr. President, I support the motion that Senator Curry has made. I believe that passage of this bill will be very fitting for this year which has been designated International Year of the Child because, indeed, what we are dealing with here are forgotten children, some four thousand of them who are languishing in foster homes across this state. Many of them have been there for an extended period [of] time. There is an opportunity through this review process to examine whether we can move some of these children into permanent homes, home settings. . . ." 22 S. Proc., Pt. 17, 1979 Sess., p. 5862.

[14] The following are relevant excerpts from state House proceedings of May 17, 1979:

"Rep. Walsh . . . .

"What the bill addresses specifically is the fact that at present *children who are committed to the Department of Children and Youth Services* as neglected, abused or dependent, are committed for indefinite periods of time, while those committed as delinquents are committed for a specific two year period.

"This bill would limit all commitments to two years and require that the

of commitment to DCYS clearly promoted periodic judicial review of actions taken, including placements of children in foster homes by that agency. Second, the General Assembly intended to conform the Connecticut State Plan for Foster Care and Adoption Assistance to the requirements of federal law. See 42 U.S.C. §§ 670 through 675. One of these federally imposed requirements was that the state plan must "assure each child in foster care *under the supervision of the State* of a dispositional hearing to be held, in a family or juvenile court . . . of competent jurisdiction . . . no later than eighteen months after the original placement (and periodically thereafter during the continuation of foster care), which hearing shall determine the future status of the child (including, but not limited to, whether the child should be returned to the parent, should be continued in foster care for a specified period, should be placed for adoption, or should (because of the child's special needs or circumstances) be continued in foster care on a permanent or long-term basis) . . . ." (Emphasis added.) 42 U.S.C. § 675 (5) (C); see Sen. Rep., No. 96-336, 96th Cong., 2d Sess. 4, reprinted in 1980 U.S. Code Cong. & Ad. News, 1448, 1453. Provision in the Connecticut plan for judicial review of such cases

Department of Children and Youth Services Commissioner petition the court 90 days prior to expiration of that commitment, to either revoke that commitment and return the child to his natural family, terminate parental rights, thereby making the child eligible for adoption, or extend the commitment for an additional two years based upon the court's finding that continued commitment would be in the best interest of the child. . . ." (Emphasis added.) 22 H. R. Proc., Pt. 24, 1979 Sess., p. 8449.

"Rep. Parker: (31st)

"I, too, rise to urge support of this bill. The previous speaker has pointed out *the problems we have with DCYS and the fact that once a child is committed* it appears that DCYS forgets about it. At the present time in our books we do not have the stick, we do not have the law to ask them to review the cases. I would like to see this review done in one year rather than two years, but I will certainly take this law tonight. I think that is a long step forward to solving some of the problems we have had with children. Thank you." (Emphasis added.) 22 H. R. Proc., Pt. 24, 1979 Sess., p. 8455.

at least every eighteen months advanced compliance with that particular federal mandate of Public Law No. 96-272, 94 Stat. 510, 514 (1980) (codified at 42 U.S.C. § 675 [5] [C]), and thereby served to satisfy congressionally imposed conditions for the continuance of federal funding in this area.[15] See 42 U.S.C. §§ 671 (a) (16) and (b), 675 (5) (B) and (C).

The legislative concerns underlying the establishment of the time limits of § 46b-129 (d) and (e) are thus unambiguous: to establish a durational limitation on the frequently lengthy placement of children in foster homes or other institutions while committed to DCYS so as to require periodic judicial review of their cases. The legislature, however, did not contemplate mandatory, periodic judicial review of cases in which custody, rather than ordered as a commitment of the child to DCYS, had been vested by the court in an appropriate third party in accordance with § 46b-129 (d).

---

[15] The need to comply with federal requirements was the actual purpose of revising the durational limit on the commitment of custody to DCYS from twenty-four months to eighteen months:

"Mr. Ray Farrington: My name is Ray Farrington. *I'm the Director of the Division of Children and Protective Services of the Department of Children and Youth Services.* I'm here to speak on behalf of *Bill No. 5754,* An Act Concerning the Commitment to the Commissioner of Children and Youth Services of Uncared for, Neglected or Dependent Children.

"This bill changes current law only in that it limits commitment of uncared for, neglected or dependent children and youth by the courts to the Department of Children and Youth Services for an initial period of 18 months, rather than the current 24 months. In other words, it provides for a court review of the case in 18 months, rather than at the end of 2 years.

"Passage of this bill would put Connecticut in conformity with the Federal Mandate of Public Law 96-272 — The Adoption Assistance and Child Welfare Act. The Department agrees with the philosophy embodied in the law and also notes that the bill is a condition for the continuance of Title IV B monies coming to the state.

"We respectfully request a favorable report on Bill 5754.

"Rep. Tulisano: Are you telling us that's absolutely necessary?

"Mr. Farrington: Yes, sir.

"Rep. Tulisano: For money.

"Mr. Farrington: It is." (Emphasis added.) Joint Standing Committee Hearings, Judiciary, Pt. 4, 1982 Sess., pp. 981–82.

In her brief on appeal, the mother argues that the "transfer of commitment of the children . . . to their paternal grandmother . . . was not a legal appointment of another guardian . . . because appointment of a [legal] guardian for a minor [child] is within the jurisdiction of the Court of Probate" rather than in the Juvenile Court. See General Statutes §§ 45-43a, 45-44c, 45-45.[16] This issue was not raised in the court

[16] "[General Statutes] Sec. 45-43a. REMOVAL OF PARENT AS GUARDIAN OF MINOR. The following persons may apply to the court of probate for the district in which the minor resides for the removal as guardian of one or both parents of the minor: (1) Any adult relative of the minor, including those by blood or marriage; (2) the court on its own motion; or (3) counsel for the minor."

"[General Statutes] Sec. 45-44c. REMOVAL OF PARENT AS GUARDIAN. If the court of probate finds that notice has been given or a waiver has been filed, as provided in section 45-44b, it may remove a parent as guardian, if the court finds one of the following: (1) The parent consents to his or her removal as guardian; or (2) the minor child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility for the minor's welfare; or (3) the minor child has been denied the care, guidance or control necessary for his or her physical, educational, moral or emotional well-being, as a result of acts of parental commission or omission, whether the acts are the result of the physical or mental incapability of the parent or conditions attributable to parental habits, misconduct or neglect, and the parental acts or deficiencies support the conclusion that the parent cannot exercise, or should not in the best interests of the minor child be permitted to exercise, parental rights and duties at this time; or (4) there are no identifiable acts of parental commission or omission as set forth in subdivision (3) of this section, but it nevertheless appears to the court that: (A) There is no ongoing, parent-child relationship which is defined as the relationship that develops as a result of a parent's having met on a continuing day to day basis the physical, emotional, moral and educational needs of the minor child; and (B) to allow further time for the establishment or reestablishment of the parent-child relationship, at this time, would be detrimental to the best interests of the minor child."

"[General Statutes] Sec. 45-45. APPOINTMENT OF GUARDIAN FOR MINOR; RIGHTS SAME AS OF SOLE SURVIVING PARENT. (a) If any minor has no parent or guardian of his or her person, the court of probate for the district in which the minor resides may, on its own motion, appoint a guardian of the person of the minor, taking into consideration the standards provided in section 45-45b. Such court shall take of such guardian a written accept-

below; in fact, the mother herself agreed, in September, 1983, that custody remain in the paternal grandmother in accordance with the DCYS study, which also provided for continuation of a visitation plan for the mother with the children. The question of subject matter jurisdiction, however, may be raised at any time in the proceedings. Practice Book § 3110; *Laurel Park, Inc.* v. *Pac,* 194 Conn. 677, 679 n.1, 485 A.2d 1272 (1984); *State ex rel. Kelman* v. *Schaffer,* 161 Conn. 522, 527, 290 A.2d 327 (1971); *Collins* v. *York,* 159 Conn. 150, 155, 267 A.2d 668 (1970); *United Oil Co.* v. *Urban Redevelopment Commission,* 158 Conn. 364, 384, 260 A.2d 596 (1969); *Tellier* v. *Zarnowski,* 157 Conn. 370, 373, 254 A.2d 568 (1969); *Lewis* v. *Rosen,* 149 Conn. 734, 735, 181 A.2d 592 (1962); see *State* v. *Malkowski,* 189 Conn. 101, 104–105, 454 A.2d 275 (1983); *Liebeskind* v. *Waterbury,* 142 Conn. 155, 159, 112 A.2d 208 (1955). We address the mother's argument, but we do not agree with it.

Since July 1, 1978, jurisdiction over juvenile matters in this state has been vested in the Superior Court. General Statutes § 46b-122 (formerly § 51-303). The legislature has defined "juvenile matters" to "include all proceedings concerning uncared-for, neglected or dependent children and youth and delinquent children within this state, termination of parental rights of children committed to a state agency, matters concerning families with service needs and contested termination of parental rights transferred from the probate court, but does not include matters of guardianship and adoption or matters affecting property rights of any child or youth *over which the probate court has jurisdic-*

ance of guardianship and, if the court deems it necessary for the protection of the minor, a probate bond.

"(b) When appointing a guardian under this section, the court shall take into consideration the minor's wishes, if he or she is over the age of fourteen.

"(c) The guardian shall have the same right to custody and control which the sole surviving parent of a minor has."

*tion. . . ."* (Emphasis added.) General Statutes § 46b-121.[17] In addition, the General Assembly has granted to "the superior court which has venue"; General Statutes § 46b-129 (a); jurisdiction over neglect petitions and the commitment of custody-guardianship of children who have been adjudicated "uncared-for, neglected or dependent." General Statutes § 46b-129 (d); see *Hospital Administrator* v. *Anonymous (1979-5),* 35 Conn. Sup. 241, 243, 406 A.2d 871 (1979). As we noted above, General Statutes § 46b-129 (d) authorizes the court to commit custody

---

[17] General Statutes § 46b-121 provides: "JUVENILE MATTERS DEFINED, AUTHORITY OF COURT. Juvenile matters include all proceedings concerning uncared-for, neglected or dependent children and youth and delinquent children within this state, termination of parental rights of children committed to a state agency, matters concerning families with service needs and contested termination of parental rights transferred from the probate court, but does not include matters of guardianship and adoption or matters affecting property rights of any child or youth over which the probate court has jurisdiction. In such juvenile matters, the superior court shall have authority to make and enforce such orders directed to parents, including any person who acknowledges before said court paternity of a child born out of wedlock, guardians, custodians or other adult persons owing some legal duty to a child or youth therein, as it deems necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child or youth subject to its jurisdiction or otherwise committed to or in the custody of the commissioner of children and youth services. Said court shall also have authority to grant and enforce injunctive relief, temporary or permanent in all proceedings concerning juvenile matters. If any order for the payment of money is issued by said court, the collection of such money shall be made by said court, except orders for support of children committed to any state agency or department, which orders shall be made payable to and collected by the department of administrative services. In juvenile matters, the court shall have authority to make and enforce orders directed to persons liable hereunder on petition of said department of administrative services made to said court in the same manner as is provided in section 17-324, in accordance with the provisions of subsection (b) of section 17-31i, section 17-32, 17-82e, 17-295, 17-295a, 46b-129 or 46b-130, and all of the provisions of section 17-324 shall be applicable to such proceedings. Any judge hearing a juvenile matter may make any other order in connection therewith within his authority to grant as a judge of the superior court and such order shall have the same force and effect as any other order of the superior court."

to DCYS or to "vest such child's or youth's care and personal custody . . . with any person found to be suitable and worthy of such responsibility by the court . . . and . . . upon such vesting of his care, such other . . . individual shall be the guardian of such child or youth . . . ."

We recognize that the Probate Court holds jurisdiction over certain guardianship matters involving children. See, e.g., General Statutes §§ 45-43a, 45-44c, 45-45; see also General Statutes § 46b-121. We also recognize that the ultimate effect of a custody-guardianship vested by the Superior Court in a "suitable and worthy" third party pursuant to § 46b-129 (d) may be identical to that rendered by an appointment of guardianship made by the Probate Court. "[W]hen two statutes relate to the same subject matter every effort should be made to find a reasonable field for the operation of both statutes. *State* v. *Carbone,* 172 Conn. 242, 256, 374 A.2d 215 [cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063] (1977)." *Blue Cross & Blue Shield of Connecticut, Inc.* v. *Mike,* 184 Conn. 352, 362, 439 A.2d 1026 (1981). "[W]here there is a reasonable field of operation for each statute which does not impinge on the domain of the other, it is the court's duty to give them concurrent effect. *State* v. *White,* 169 Conn. 223, 233–34, 363 A.2d 143, cert. denied, 423 U.S. 1025, 96 S. Ct. 469, 46 L. Ed. 2d 399 [1975]; see 73 Am. Jur. 2d, Statutes § 253." *Budkofsky* v. *Commissioner of Motor Vehicles,* 177 Conn. 588, 592, 419 A.2d 333 (1979); see also *Connecticut Life & Health Ins. Guaranty Assn.* v. *Jackson,* 173 Conn. 352, 359, 377 A.2d 1099 (1977); *Hirschfeld* v. *Commission on Claims,* 172 Conn. 603, 607, 376 A.2d 71 (1977); *State* v. *Carbone,* 172 Conn. 242, 256, 374 A.2d 215, cert. denied, 431 U.S. 967, 97 S. Ct. 2925, 53 L. Ed. 2d 1063 (1977); *Waterbury Teachers Assn.* v. *Furlong,* 162 Conn. 390, 404–405, 294 A.2d 546 (1972); *Shanley* v.

*Jankura,* 144 Conn. 694, 702, 137 A.2d 536 (1957); *Leete* v. *Griswold Post,* 114 Conn. 400, 405, 158 A. 919 (1932).

The language of § 46b-129, particularly that of subsection (d), reveals that the General Assembly contemplated a clear distinction between guardianships ordered by the Superior Court in accordance with that provision and those ordered by appointment of the Probate Court. Accordingly, we construe § 46b-129 (d) as conferring exclusive jurisdiction on the Superior Court to enter "custody-guardianship orders" in those cases in which there is a "finding and adjudging" by that court that the "child or youth is uncared-for, neglected or dependent," and this finding, moreover, must be the product of a neglect petition filed with the Superior Court pursuant to § 46b-129. This construction still allows effect to be given those provisions of our statutes that authorize the Probate Court in cases not brought under § 46b-129 to remove a parent as guardian and then to appoint a guardian of a minor under such statutes as General Statutes §§ 45-43a, 45-44, 45-44c, 45-45.[18]

[18] This construction is consistent also with General Statutes § 46b-121, which excludes from Superior Court jurisdiction, "matters of guardianship and adoption or matters affecting property rights of any child or youth *over which the probate court has jurisdiction,*" because we hold today that the Superior Court has exclusive jurisdiction to enter a custody-guardianship order that is a product of a neglect petition filed with the Superior Court pursuant to § 46b-129. Therefore, the Probate Court does not possess jurisdiction to adjudicate custody-guardianship matters that arise under § 46b-129 (d).

We add that courts of probate are strictly statutory tribunals and, as such, they have only such powers as are expressly or implicitly conferred upon them by statute. *Potter* v. *Alcorn,* 140 Conn. 96, 100, 99 A.2d 97 (1953). We do not agree with the natural mother's argument that the appellants' view concerning "custody-guardianship" in effect invokes powers that are within probate jurisdiction. While it is true that some matters of guardianship are within probate jurisdiction, we point out that § 46b-129 concerns only "any child or youth [who is adjudged] uncared-for, neglected or dependent" rather than all matters of guardianship. *Eason* v. *Welfare*

Finally, we note that the Superior Court's transfer of "commitment" of these children vesting custody-guardianship in their grandmother is without question an order subject to modification by that court if such is in the best interests of the children. We have already stated that "an adjudication of neglect that results in custody by DCYS is neither final nor irrevocable." *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 264, 471 A.2d 1380 (1984). We perceive no reason, nor did the legislature express one, to insulate such a vesting under § 46b-129 (d) to a third party from subsequent modification or revocation. Both the attorney general and the paternal grandmother, in their briefs, concede that the natural mother may petition the court any time prior to the child's eighteenth birthday for revocation of the commitment to the grandmother. A judicial hearing would then provide to the natural mother the opportunity of showing that no cause for "commitment" exists. See generally *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 659, 420 A.2d 875 (1979).

There is error, the order is vacated and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.

---

*Commissioner*, 171 Conn. 630, 635, 370 A.2d 1082 (1976), cert. denied, 432 U.S. 907, 97 S. Ct. 2953, 53 L. Ed. 2d 1079 (1977). Moreover, prior to court consolidation on July 1, 1978, the precursor of § 46b-129, § 17-62, was within the jurisdiction of the then Juvenile Court. In any event, we can presume that the legislature, in originally assigning this power to the Juvenile Court and then transferring it to the Superior Court, was aware of existing relevant statutes, including probate statutes, and intended them to be read to make one consistent body of law. *Farms Country Club, Inc.* v. *Carini*, 172 Conn. 439, 444, 374 A.2d 1094 (1977). We do not impute to the legislature an intent to pass antagonistic legislation. Id.